# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

American Preparatory Schools, Inc.,

    Plaintiff

v.

Nevada Charter Academies d/b/a American
Preparatory Academy–Las Vegas, et al.,

    Defendants

Case No.: 2:20-cv-01205-JAD-NJK

**Order Denying Plaintiff's Motion for a
Temporary Restraining Order and
Granting Motion for Leave to File Excess
Pages, Denying Defendants' Anti-SLAPP
Motions, and Granting in Part Defendants'
Motions to Dismiss**

[ECF Nos. 3, 31, 40, 47, 48]

American Preparatory Schools, Inc. (APS) sues its former employee Rachelle Hulet,
Nevada Charter Academies d/b/a American Preparatory Academy–Las Vegas (APA-LV), and
APA-LV's five-person governing-board for violations of federal and state law connected to the
defendants' attempts to open a new, public charter school using APS's intellectual property and
trademarked materials.[1]  APS moves for a temporary restraining order.[2]  The defendants move to
dismiss APS's complaint as insufficiently pled,[3] while also claiming that they are immune from
suit and that APS's complaint is an illegal attempt to chill their speech.[4]  Because APS has failed
to show that it will be irreparably harmed by the defendants' conduct, I deny its motion for a
temporary restraining order.  I also deny the defendants' anti-SLAPP motions because APS does
not attempt to censure the defendants' good-faith communications or free-speech rights.  But

---

[1] ECF No. 39 (complaint).

[2] ECF No. 3 (motion for a temporary restraining order).

[3] ECF Nos. 40 (Hulet's motion to dismiss), 41 (governing-board members' joinder), 42 (APA-LV's joinder).

[4] ECF Nos. 47 (Hulet's anti-SLAPP motion to dismiss), 48 (governing-board members' anti-SLAPP motion to dismiss), 52 (governing-board members' joinder).

1 | some of APS's claims are insufficiently pled with respect to certain defendants, largely because

2 | APS attempts to hold individuals liable for corporate activities, so I grant in part the defendants'

3 | motions to dismiss and give APS leave to amend its complaint by November 17, 2020.

4 | **Background**[5]

5 | In May 2013, APS, a charter-school-management company, contracted with APA-LV to

6 | operate and manage a public charter school in Las Vegas, Nevada.[6]  The parties memorialized

7 | their contract in a management agreement, which would be in place "for a term of 2 years—

8 | subject to material and fee revision on or around June 30th of each year, by mutual consent."[7]

9 | The management agreement spelled out the parties' responsibilities and obligations, and

10 | provided two mechanisms to renew or extend the agreement beyond the initial two-year period:

11 | (1) "with consent of both parties . . . subject to written notice no later than 30 days prior to the

12 | termination date," or (2) the contract would "automatically renew" when the school's charter was

13 | renewed with the relevant state-authorizing entity.[8]  The agreement also provided that either

14 | party could terminate the relationship "for cause prior to the end of the term by providing 30

15 | days advance written notice to the other party."[9]

16 | According to APS, the parties operated under this agreement without incident for roughly

17 | seven years.[10]  And while the parties never formally renewed their agreement with written

18 | consent—excepting a belated, 2017 consent letter sent by an APA-LV governing-board

---

20 | [5] This is merely a summary of facts alleged in the complaint and should not be construed as findings of fact.

21 | [6] ECF No. 39 at ¶¶ 31–32, 34.

22 | [7] *Id.* at ¶ 34; *see also* ECF No. 40-1 at 2.

22 | [8] ECF No. 40-1 at 2.

23 | [9] *Id.* at 2.

[10] *C.f.* ECF No. 39 at ¶ 62.

member—the parties conducted business each year as if the agreement were renewed, with APS managing the school and APA-LV paying APS for its services.[11]

But discontented rumblings between the parties began in July 2019 that, by Summer 2020, resulted in the collapse of the parties' relationship and this lawsuit.[12]  Though the defendants vehemently contest the underlying facts of this dispute,[13] it appears that Hulet—an employee of APS who coordinated with APA-LV's governing board—orchestrated a coup against APS, threatening to form her own management company to handle the charter school.[14] On June 11, 2020, APA-LV voted not to renew its contract with APS and launched a new charter school under the name Amplus Academy.[15]  After APS fired Hulet on June 18, 2020, and APA-LV hired her, she "confiscated APS computers," which contained APS's commercial and intellectual property (like its curricula, policy manuals, teacher training materials and presentations) and refused to return those computers until she had copied them and erased some of the data.[16]

---

[11] *Id.* at ¶¶ 35–39.

[12] *Id.* at ¶ 50.

[13] The defendants' filings, which include their opposition to APS's motion for a temporary restraining order, and motions to dismiss on anti-SLAPP and Rule 12(b)(6) grounds, are laced with needless opprobrium and their own factual allegations.

[14] ECF No. 39 at ¶ 51; *see id.* at ¶ 55 ("Ms. Hulet also insisted that she had 'the confidence of the board,' which Ms. Sharette interpreted as a threat in that Ms. Hulet was stating that she believed she had the power to influence the board of APA-LV to make this change, regardless of whether Ms. Sharette agreed to it or not."); ¶ 60 ("Ms. Hulet once again expressed her desire to take over the contract with the APA-LV board.").

[15] *Id.* at ¶¶ 78, 80, 83.

[16] *Id.* at ¶¶ 24–25, 30, 66, 75–76.

APS brings a slew of claims against APA-LV, its governing-board members[17] (in their individual capacities), and Hulet, seeking damages for breach of contract, breach of the implied covenant of good faith and fair dealing, federal and common-law copyright infringement, misappropriation of commercial property, conspiracy, unjust enrichment, conversion, breach of fiduciary duty, intentional interference with contractual relations, and federal unfair competition, as well as a request for declaratory judgment.[18]  APS also seeks a temporary restraining order against the defendants.[19]  For their part, Hulet, APA-LV, and the governing-board members seek to dismiss the action entirely, arguing that they are broadly immune from suit and invoking Rule 12(b)(6) and Nevada's anti-SLAPP statute.[20]

## Discussion

## I.   Temporary restraining order [ECF No. 3]

A temporary restraining order is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."[21]  As the Supreme Court clarified in *Winter v. Natural Resources Defense Council, Inc.*, a plaintiff seeking a temporary restraining order, like a preliminary injunction, must "establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."[22]  In the Ninth Circuit, "if a plaintiff can only show that there are 'serious questions going to the

---

[17] The governing board includes Defendants Lee Iglody, Jonathan Gardner, Melissa St. Jean, Ernie Elliot, and Candyce Farthing.

[18] *See generally* ECF No. 39.

[19] ECF No. 3.

[20] ECF Nos. 31, 40, 47, 48.

[21] *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008)

[22] *Id.*; *accord Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239 (9th Cir. 2013).

merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of the hardships tips *sharply* in the plaintiffs' favor,' and the other two *Winter* factors are satisfied."[23]   While APS has shown some likelihood of success on the merits, it has not made the requisite showing of irreparable harm.  So I deny its request for a temporary restraining order.

### A.      Likelihood of success on the merits

There is some likelihood that APS will prevail on its breach-of-contract and trademark-infringement claims.  Both parties present a bevy of arguments that I will not rehash here because many are either addressed below or unresolvable at this nascent stage of the litigation.[24] Put simply, and with respect to APS's breach-of-contract claim, the parties dispute whether (1) the contract's renewal term is enforceable and (2) whether APA-LV breached the agreement or lawfully terminated it.  APS presents sufficient evidence and argument indicating that the parties' contract renewed the prior year by mutual consent.[25]  And while APA-LV has marshalled considerable evidence that APS failed to adequately manage the school, which may be sufficient grounds to terminate the agreement,[26] it has not shown that it followed the contract's express termination procedure.[27]

---

[23] *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)) (emphasis in original).

[24] *See infra* Section II.B.

[25] *See infra* Section II.B.3.

[26] *See* ECF No. 21 at 11–13 (noting that APS has failed to follow Nevada standards in establishing its curriculum); ECF No. 40-1 at 2 (articulating "gross negligence" as a basis for contract termination).

[27] ECF No. 40-1 at 2 (requiring "written notice" provided "30 days" in advance of termination).

APS's trademark-infringement claims seemingly turn on whether APA-LV's rebranding and advertising materials continue to invoke APS's trademark, thereby causing consumer confusion.[28]  The Ninth Circuit advises that courts look to the following factors to guide a determination of likelihood of confusion:

> similarity of conflicting designations; relatedness or proximity of the two companies' products or services; strength of the [plaintiff's] mark; marketing channels used; degree of care likely to be exercised by purchasers in selecting goods; [defendant's] intent in selecting its mark; evidence of actual confusion; and likelihood of expansion in product lines."[29]

APA-LV's new name—"Amplus" or "AmPlus Academy"—appears derivative of APS's mark "American Preparatory Academy;" given the years the parties worked together, it's hardly a stretch to imagine that a consumer may be confused by the names, particularly if APA-LV's marketing materials and website employ the acronym "APA."  APS has also sufficiently alleged that APA-LV plans to or is continuing to use its intellectual property.  And APS has certainly indicated a desire to remain in the Las Vegas market, either by establishing its own charter school or managing a new charter school under its brand.  At this stage, I can find that APS could prevail on these claims.

## B.   Irreparable harm

But APS has not shown that "irreparable injury is likely in the absence of an injunction," so I cannot grant its request.[30]  "Monetary injury is not normally considered irreparable,"[31] and

---

[28] As discussed *infra*, the standards governing APS's three trademark claims are similar.  *See infra* Section II.B.6.

[29] *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1053–54 (9th Cir. 1999).

[30] *Winter*, 55 U.S. at 22 (emphasis omitted).

[31] *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1197, 1202 (9th Cir. 1980) (holding that "a diminution of revenues, a diminution of the market value of

"[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."[32] APS struggles to show any injury other than a monetary one: it claims it has lost money due to the defendants' breach, that the defendants' conduct may drive it out of business in Las Vegas, and that it will "lose its only foothold in the Nevada market."[33]  Facially, these are all monetary harms.  The Ninth Circuit considered and rejected similar arguments in *Los Angeles Memorial Coliseum Commission v. National Football League*, dismissing a plaintiff's arguments that it would lose money and "its only opportunity" to develop its business in the area as insufficiently demonstrating irreparable harm.[34]  There, as here, the plaintiff failed to show that it would be unable to develop its business by contracting with another company and failed to make a showing that the defendants' conduct "threatened to put [plaintiff] out of business."[35]  APS proffers no reason to deviate from this clearly established precedent.  Because APS has not established that it is likely to suffer irreparable harm, I need not address whether the balance of hardships tips in its favor or that a temporary restraining order is in the public interest.  I thus deny APS's motion for a temporary restraining order.

**II.   Motions to dismiss**

The defendants seek dismissal of APS's complaint and join one another's motions for dismissal, arguing that they are government actors immune from suit, APS's claims are

---

plaintiff's property and the loss of substantial goodwill normally attached to a profitable enterprise" are "but monetary injuries which could be remedied by a damage award" and insufficient to show irreparable harm).

[32] *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (internal quotation marks and citations omitted).
[33] ECF No. 32 at 16.

[34] *Los Angeles Mem'l Coliseum Comm'n*, 634 F.2d at 1202–03.

[35] *Id.*

insufficiently pled, and Nevada's anti-SLAPP statute bars this suit. They also request judicial notice of various matters in support of these motions, which largely assert their own understanding of the facts to ensure dismissal of APS's claims at the pleading stage. These arguments run scattershot throughout the defendants' briefing, and each joinder motion presents new arguments to supplement the initial motion, so I take each set of dismissal motions in turn.

## A.     Anti-SLAPP motions

Nevada's anti-SLAPP statute works as a "procedural mechanism to dismiss meritless lawsuits that a [plaintiff] initiates primarily to chill" the exercise of a plaintiff's "First Amendment free speech rights before incurring the costs of litigation."[36] NRS 41.660 provides a two-step approach for courts to resolve an anti-SLAPP motion. First, the defendants must "establish, by a preponderance of the evidence, that the [plaintiff's] claim is based upon a good-faith communication in furtherance of the right to petition or the right to free speech in direct connection with an issue of public concern."[37] This burden can be satisfied by showing that plaintiff's claim falls within one of four statutory categories of communication and that the communication at issue was either truthful or made without knowledge of its falsehood.[38] If they succeed, "the burden shifts to the plaintiff to show 'with prima facie evidence a probability of prevailing on the claim.'"[39] APS exclusively challenges the defendants' showing on the first prong, noting that its claims are not based upon the defendants' good-faith communications, but

---

[36] *Coker v. Sassone*, 432 P.3d 746, 748 (Nev. 2019) (internal quotation marks and alteration omitted).

[37] Nev. Rev. Stat. § 41.660(3)(a).

[38] *Id.* § 41.637; *see also Coker*, 432 P.3d at 750.

[39] *Coker*, 432 P.3d at 749 (quoting *Shapiro v. Welt*, 389 P.3d 262, 267 (Nev. 2017)).

upon the defendants' breach of contract, theft of APS's intellectual property, and copyright infringement.[40]

The governing-board members and Hulet have failed to meet their statutory burden of showing, by a preponderance of the evidence, that APS's claims are based on the defendants' good-faith communications.  Nevada's anti-SLAPP statute "does not exclude any particular claim for relief from its scope," focusing instead "on the defendant's *activity*, not the form of the plaintiff's claims for relief."[41]  Courts should direct their focus to whether the plaintiff's "action takes aim at an act that furthers [a defendant's] free speech rights."[42]  Hulet argues that APS's suit retaliates against her for her honest communications with the governing board regarding APS's supposed managerial failings.[43]  She downplays APS's copyright and conversion claims as diversionary tactics, while maintaining that it is only her communications that are maligned as

---

[40] Because this case can be resolved at the first step of the anti-SLAPP analysis, I need not address the standard of review accorded anti-SLAPP motions that invoke the second step and require a determination of whether the plaintiff has met her burden of proving success on the merits.  *See Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 833 (9th Cir. 2018) (holding that the second prong of California's anti-SLAPP statute may involve questions of evidentiary proof, and subsequent evaluation under either Rule 12(b)(6) or Rule 56).

[41] *Omerza v. Fore Stars, Ltd*, No. 76273, 2020 WL 406783, at *1 (Nev. Jan. 23, 2020) (unpublished); *see also Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 422 (9th Cir. 2014) ("[W]e ask whether GLAAD's state law claims are based on conduct in furtherance of CNN's right of free speech in connection with a matter of public interest."); *c.f. Navellier v. Sletten*, 52 P.3d 703, 711 (Cal. 2002) (discussing California's anti-SLAPP statute, noting that it applies to an action "arising from" the defendant's protected activity, and observing that "[n]othing in the statute itself categorically excludes any particular type of action from its operation").

[42] *Greater Los Angeles Agency on Deafness, Inc.*, 742 F.3d at 422.

[43] ECF No. 47 at 19.

wrongful conduct.[44]  The governing-board members join in her motion[45] and argue similarly in their own.[46]

The defendants' arguments are not persuasive because they merely obfuscate the nature of APS's claims.  In *Jordan-Benel v. Universal City Studios, Inc.*, the Ninth Circuit advised courts considering the first prong of an anti-SLAPP challenge to focus on "the specific act of wrongdoing challenged by the plaintiff" and from which the claim arises.[47]  There, the court determined that a plaintiff's contract claim turned on the defendant's failure to pay, and the fact that the failure to pay involved the creation of a film and protected speech had nothing to do with the "overall thrust of the complaint."[48]  Similarly here, Hulet's alleged theft of APS's computers and deletion of APS's data—as well as Hulet's and the governing-board members' attempts to establish a new charter school using APS's copyrighted materials—have nothing to do with speech.  And APS's conspiracy, breach-of-contract, and breach-of-the-implied-covenant claims[49] do not turn on speech; they turn on whether the defendants failed to pay APS or timely

---

[44] ECF No. 57 at 3.

[45] ECF No. 52.

[46] ECF No. 48 at 11.

[47] *Jordan-Benel v. Universal City Studios, Inc.*, 859 F.3d 1184, 1190–91 (9th Cir. 2017).  While the *Jordan-Benel* court interpreted California's anti-SLAPP law, the Nevada Supreme Court has "repeatedly recognized the similarities between California's and Nevada's anti-SLAPP statutes" and "routinely look[ed] to California courts for guidance in this area."  *Coker*, 432 P.3d at 749.  I see no reason to reject *Jordan-Benel*'s reasoning merely because it involves California law.

[48] *Jordan-Benel*, 859 F.3d at 1191.

[49] As I explain below, APS's breach-of-fiduciary duty claim against Hulet is inadequately pled.  It is conceivable, however, that amendment of this claim could provide ground for a successive anti-SLAPP motion, should APS allege that Hulet's protected, good-faith speech was the wrongful conduct that breached her duty of loyalty.

1  terminated the parties' agreement.[50]  So, just as in *Jordan-Benel*, the acts of wrongdoing

2  challenged by the complaint are not speech-based.

3    The Ninth Circuit's reasoning in *Doe v. Gangland Productions, Inc.*[51] confirms my

4  analysis.  In finding that the plaintiff's lawsuit arose from protected speech made via broadcast,

5  the *Gangland Productions* court reasoned that "'[b]ut for the broadcast and [d]efendants' actions

6  in connection with that broadcast, [p]laintiff would have no reason to sue [d]efendants."[52]  The

7  same cannot be said here.  This case does not hinge on the fact that the defendants voted at a

8  board meeting but whether APA-LV breached its contract with APS or timely terminated the

9  contract,[53] whether Hulet stole intellectual property and breached her duties to her employer, and

10  whether APA-LV's continued operation violates APS's copyrights.  None of these claims finds

11  its hook in the defendants' speech.

12    Granting the defendants' anti-SLAPP motion would render almost all suits subject to an

13  anti-SLAPP motion when an aspect of a defendant's unlawful conduct involves a public

14  discussion of her desire to commit an illegal act.  Because the defendants have not met their

15  burden of showing that this suit arises from their good-faith communications, I need not and do

16  not reach the second prong of the anti-SLAPP analysis to deny their motion.[54]

17

18

---

19  [50] *Jordan-Benel*, 859 F.3d at 1192 ("Here . . . the alleged protected free speech activity—creation
20  and distribution of major motion pictures—was not the specific wrongful act that gave rise to the
    claim.").

   [51] *Doe v. Gangland Prods., Inc.*, 730 F.3d 946 (9th Cir. 2013).
21  [52] *Id.* at 955.

22  [53] As noted *infra*, APS's breach-of-contract claim is insufficiently pled against the governing-
    board members and Hulet.

23  [54] APS requests attorneys' fees.  ECF No. 56 at 9.  But because I do not find that "the motion
    was frivolous or vexatious," I decline to award them.  *See* NRS 41.670(2).

**B.      Rule 12(b)(6) motions**

District courts employ a two-step approach when evaluating a complaint's sufficiency on a Rule 12(b)(6) motion to dismiss.  The court must first accept as true all well-pled factual allegations in the complaint, recognizing that legal conclusions are not entitled to the assumption of truth.[55]  Mere recitals of a claim's elements, supported by only conclusory statements, are insufficient.[56]  The court must then consider whether the well-pled factual allegations state a plausible claim for relief.[57]  A claim is facially plausible when the complaint alleges facts that allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct.[58]  A complaint that does not permit the court to infer more than the mere possibility of misconduct has "alleged—but not shown—that the pleader is entitled to relief," and it must be dismissed.[59]

**1.      *Requests for judicial notice***

A district court is generally prohibited from considering "any material beyond the pleading in ruling on a Rule 12(b)(6) motion."[60]  But this rule is subject to certain exceptions. "A court may take judicial notice of 'matters of public record' without converting a motion to dismiss into a motion for summary judgment."[61]  A court may also consider, in deciding a Rule 12(b)(6) motion, "documents whose contents are alleged in a complaint and whose authenticity

---

[55] *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

[56] *Id.*

[57] *Id.* at 679.

[58] *Id.*

[59] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[60] *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1242, 1555 n.19 (9th Cir. 1990).

[61] *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (quoting *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986)).

no party questions, but which are not physically attached to the pleading."[62]  But "a court may not take judicial notice of a fact that is 'subject to reasonable dispute.'"[63]  Hulet requests that I take judicial notice of the parties' management agreement,[64] the charter contract between APA-LV and the State of Nevada,[65] various board-meeting minutes and notes, her lengthy characterizations of those meetings (which she claims "establish that [the complaint's] allegations are not true"), APA-LV's website, and APS's purportedly negative press coverage.[66] In joining her motion to dismiss and asserting their own bases for dismissal, the governing-board members and APA-LV also rely on these factual allegations.[67]

I find that the parties' management agreement is suitable for judicial notice because it is described in the complaint and forms the basis of APS's breach-of-contract claim, and neither party disputes its accuracy.[68]  But I deny Hulet's remaining requests.[69]  Not only are none of

---

[62] *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

[63] *Lee*, 250 F.3d 689 (quoting Fed. R. Evid. 201(b)).

[64] ECF No. 40-1.

[65] ECF No. 40-2, 40-3.

[66] ECF No. 40 at 10–13.

[67] *See* ECF Nos. 41, 42.

[68] *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (noting that a court may consider evidence if the complaint necessarily relies on it, so long as the "complaint refers to the document," "the document is central to the plaintiff's claim," and "no party questions the authenticity of the copy attached to the 12(b)(6) motion").

[69] Hulet's motion to dismiss contains pages of single-spaced, factual allegations that purport to contradict the complaint's allegations, which are inappropriate in a Rule 12(b)(6) motion, as well as footnoted, single-spaced legal citations in a font smaller than size 12 and briefing with less than a 1-inch margin, which is seemingly designed to subvert the page-limit rules in this district. *See* L.R. IA 10-1; L.R. 7-3(b).  The governing-board defendants submit similarly styled briefing. The parties are advised to present arguments that are relevant and appropriate to their motion, and briefs that conform to this district's rules.  Continued violation of these rules will result in my striking the parties' briefing.  *See* L.R. IA 10-1(d).

these documents' contents described by, or alluded to, in the complaint,[70] but Hulet has failed to lay the foundation for these documents, demonstrate that these documents are capable of accurate and ready determination, or explain why the content of these documents (mostly taken from websites) is reliable.[71]   And even were I to take judicial notice of Hulet's documents, I can only do so to "indicate what was in the public realm at the time, not whether the contents of those [documents] were in fact true."[72]   Hulet, however, explicitly asks me to ignore this rule, to inappropriately leverage extraneous facts to refute APS's allegations at the pleading stage and establish a competing factual narrative.[73]   I decline her invitation to do so, and I will only consider the defendants' arguments regarding the sufficiency of APS's complaint allegations based on facts alleged in the complaint and documents capable of judicial notice.

---

[70] Hulet claims that the charter contract is described in paragraph 32 of the complaint.  ECF No. 40 at 6.  It is not.  That paragraph of the complaint refers to the parties' management agreement, which itself contains references to "charter obligations" that may or may not have anything to do with the documents Hulet attaches to her motion, given that she provides no authenticating declaration.  APS also does not rely on the charter contract in its complaint to assert its claims.

[71] *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) (noting that press releases were subject to judicial notice for the limited purpose of showing market awareness of those press releases' content and not for the truth of the matters contained in those press releases); *In re Yagman*, 473 Fed. App'x. 800, 801 n.1 (9th Cir. 2012) (unpublished) (declining to take judicial notice of information contained on third party websites, given their lack of credibility); *see Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1027–33 (C.D. Cal. 2015) (collecting cases showing why websites, press releases, unauthenticated documents, transcripts, and other attached documents are not and should not be subject to judicial notice).

[72] *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (internal citations omitted).

[73] *See, e.g.*, ECF No. 40 at 8 (arguing that, under the charter contract, Hulet was "actually" employed by the school and therefore immune from suit); 16 (arguing that the defendant's website indicates that it has no plans to use APS's intellectual property); 19 (claiming that the complaint's allegations regarding Hulet's desire to start a competing venture are a "paranoid delusion" and "debunked by public records"); 21 (claiming that the school board's statements make it clear that the school did not breach its contract with APS, but declined to renew the contract).

## 2. *Immunity*

Both Hulet and the governing-board members argue that they are broadly immune from APS's suit—Hulet claims she is entitled to "derivative immunity," while the governing board members attempt to invoke discretionary-function immunity.  Nevada has waived its sovereign immunity subject to certain exceptions, including the exception outlined by NRS 41.032(2), which provides that state officers, employees, and contractors are "immune from liability for actions stemming from the exercise of discretionary functions or the performance of discretionary duties."[74]  Nevada has adopted the federal, *Berkovitz-Gaubert* discretionary-immunity test, which immunizes state agents when their decisions (1) "involve an element of individual judgment or choice" and (2) "[is] based on consideration of social, economic, or political policy."[75]  "[I]f the injury-producing conduct is an integral part of governmental policy-making or planning, if the imposition of liability might jeopardize the quality of the governmental process, or if the legislative or executive branch's power or responsibility would be usurped, immunity will likely attach under the second criterion."[76]  Courts need not determine

---

[74] *Martinez v. Maruszczak*, 168 P.3d 720, 723 (Nev. 2007) (citing NRS 41.032(2)) ("[N]o action may be brought . . . against an immune contractor or an officer or employee of the State or any of its agencies or political subdivisions which is . . . based upon the exercise or performance or the failure to exercise or perform a discretion function or duty on the part of the State . . . .")).

[75] *Id.* at 729 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)); *see also Gonzalez v. Las Vegas Metro. Police Dept.*, 129 Nev. 1118, at *1 (2013) (unpublished) ("In 2007, we adopted the United States Supreme Court's *Berkovitz-Gaubert* two-part test regarding discretionary immunity.").  APA-LV and the governing-board defendants incorrectly assert that federal discretionary-immunity precedent is irrelevant to this suit.  ECF No. 54 at 5; *see Paulos v. FCH1, LLC*, 456 P.3d 589, 595 (Nev. 2020) (citing *Martinez*, 168 P.3d at 727) (relying on "federal analogues" to determine whether a defendant is "entitled to discretionary-act immunity").

[76] *Martinez*, 168 P.3d at 729 (internal quotations and citations omitted).

15

that a state actor "made a conscious decision regarding policy considerations," focusing instead on "the nature of the actions taken" and "whether they are susceptible to policy analysis."[77]

Hulet and the governing-board members have not established that they are not immune from APS's suit. The class of persons that are immune from suit include employees of a charter school and employees of "the governing body of a charter school."[78] Neither party adequately briefs whether Hulet, a private employee of APS until June 18, 2020, and the governing-board members, who are volunteers,[79] were employees, contractors, or officers of a charter school within the meaning of Nevada law when they allegedly injured APS.[80] Indeed, allegations regarding Hulet's conduct giving rise to APS's breach-of-fiduciary-duty, conspiracy, and breach-of-contract claims occurred prior to her becoming an employee of APA-LV, so they presumptively fall outside of NRS 41.032's ambit.[81] Regardless, discretionary-function immunity is not available for intentional torts and bad-faith conduct,[82] so APS's claims for

---

[77] *Id.*

[78] Nev. Rev. Stat. § 41.0305, 41.0307(1)(b).

[79] ECF No. 39 at ¶¶ 8, 19, 66, 75; ECF No. 41 at 4–5.

[80] *See* Nev. Rev. Stat §§ 41.0307, 41.032(2) (providing immunity to "employees" of a "charter school" and "any officer, employee, or immune subcontractor" for a "political subdivision" of the state, which is expressly defined to include "the governing body of a charter school."). Though it does not form the basis of my decision, Hulet could not have been a state employee until at least June 18, 2020, when she was hired by APA-LV. *See* ECF No. 39 at 66, 75. Until then, she was decidedly an employee of a private company and her conduct was not immune under Nevada law.

[81] I am not persuaded by Hulet's argument that, because APS employed her to coordinate with a public charter school, she thus became an "independent contractor" of the state. APS alleges that Hulet was employed by APS until June 18, 2020, and not by Nevada or its political subdivisions. The parties' agreement only underscores this point. *See* ECF No. 40-1 at 6 ("No employee of APS will be considered an employee of APA-LV. No employee of APA-LV will be considered an employee of APS.").

[82] *Franchise Tax Bd. of Cal. v. Hyatt*, 407 P.3d 717, 841–42 (Nev. 2017) (holding that intentional torts are exempt from statutory discretionary-function immunity),*rev'd on other grounds*, 139 S.Ct. 1485 (2019); *see also Krainski v. State, ex rel. Bd. of Regents of the Nev. Sys.*

intentional interference with contractual relations, conspiracy, conversion, unfair competition, copyright infringement, and misappropriation of commercial property cannot be dismissed on this basis.

And while the governing board and APA-LV employees might be immunized in their decisions about which educational management company to work with, that does not mean that they are immune from suit for intentionally breaching a valid contract with APS. The defendants do not point to precedent showing otherwise.[83] The only case the defendants cite implying that immunity is available to state actors in a breach-of-contract suit, *Frank Briscoe Co. v. Clark County*,[84] is non-binding, unpersuasive, and relies on overturned Nevada case law. The *Frank Briscoe* court, in finding that defendants were potentially immune from contract liability for actions taken while exercising a discretionary function, relied on *State v. Silva*, which employed a now-defunct planning-versus-operational test to categorically determine when state employees waived their sovereign immunity.[85] But the Nevada Supreme Court overruled that test in *Martinez v. Maruszczak*, instead holding that discretionary-act immunity applies only to decisions grounded in social, economic, and political policy; it is not rigidly afforded to defendants based "upon the stage of the government decision-making process at which the challenged decisions were made."[86] Here, the governing-board members make no argument that

---

of Higher Educ.*, No. 62841, 2015 WL 3494961, at *1 n.3 (Nev. 2015) (unpublished) ("[I]ntentional torts and bad[-]faith conduct are exempt from statutory discretionary-function immunity."); *Falline v. GNLV Corp.*, 823 P.2d 888, 892 & n.3 (1991) (plurality opinion).

[83] The governing-board members cite numerous cases of state officers (like county contractors, district attorneys, and police officers) being immunized from liability in tort suits. *See* ECF No. 54 at 6. These cases are inapposite to this contract claim.

[84] *Frank Briscoe Co., Inc. v. Clark Cnty.*, 643 F. Supp. 93, 97–98 (D. Nev. Mar. 3, 1986).

[85] *Id.* (citing *State v. Silva*, 478 P.2d 591 (Nev. 1970)).

[86] *Martinez*, 168 P.3d at 727–28.

their breach of an agreement, and not merely their vote to not renew, could accord with any underlying policy considerations.[87]  So I decline to dismiss APS's claims against Hulet and the governing-board members on this basis.

### 3.     Breach of contract and implied covenant of good faith and fair dealing[88]

APS's breach-of-contract claim turns on whether the management agreement was still in place when APA-LV and its board voted not to renew the agreement on June 11, 2020, and whether their failure to pay APS constitutes a breach of the agreement.  APS proffers two theories explaining why the agreement was in place during the Summer of 2020: first, it claims that the parties consented to renewing the contract on July 1, 2019, by continuing to work together; and second, APA-LV renewed its charter contract with the state on June 2, 2020, which, under the terms of the management agreement, automatically renewed that agreement for an additional two-year term.  According to APS, the parties' contract would thus expire, at the earliest, on July 1, 2021.  APA-LV and the governing-board members disagree, arguing that Nevada law prohibits the management agreement's automatic-renewal provision,[89] APA-LV

---

[87] This immunity issue may well resurface after discovery commences if the governing-board members are able to show that their vote to not renew the agreement constituted termination with cause.

[88] As best I can tell, the defendants do not separately move to dismiss APS's request for declaratory judgment as to the enforceability of the contract.  And APA-LV and the governing board members make identical arguments with respect to APS's claims for breach of the implied covenant of good faith and fair dealing.  *See* ECF Nos. 41 at 8; 42 at 3.  So I interpret the claims for breach of contract and the implied covenant as rising and falling together.

[89] ECF Nos. 41 at 9; 42 at 3 (citing NRS 388A.393(1)(m) and its associated administrative code sections).

properly terminated the contract by voting to "not renew" the contract,[90] and, regardless, only APA-LV is a party to the contract.[91]

The parties devote considerable attention to NRS 388A.393(1)(m) and whether it prohibits the automatic-renewal provision in the parties' contract, but I need not address that issue to find that APS has sufficiently pled a breach-of-contract claim against APA-LV.[92]  The defendants ignore APS's first theory, which claims that the parties intended to and did renew the contract on July 1, 2019, by continuing to perform under its terms, despite not supplying written notice of their intention to renew the agreement.[93]  While this theory may prove untenable at a later stage in the proceeding, it is at least sufficient at the pleading stage to show that, through custom and practice, the parties intended their agreement to remain in effect until July 1, 2021.[94] So the only permissible way for APA-LV to terminate the agreement prior to that date would be "for cause," which requires "30 days advance written notice" to APS.[95]  APS alleges that "no notice of termination has been provided" and "there has been no serious allegations of gross negligence, fraud, criminal acts, willful negligence, nor breach of the implied terms of the

---

[90] ECF Nos. 21 at 17–18; 42 at 3.

[91] ECF No. 41 at 8.

[92] The defendants do not argue that the automatic-renewal provision invalidated the parties' entire agreement, which would require me to consider it at the pleading stage.  I note, however, that such an argument would also contradict the express terms of the contract.  *See* ECF No. 40-1 at 10 ("If any covenant or provision hereof is held to be invalid, such invalidity shall not affect other covenants and provisions of the Agreement, and such over covenants and provisions shall be given effect without the invalid provision.").

[93] *See* ECF No. 45 at 11 ("[T]he Amended Complaint specifically alleges that the Management Agreement was renewed by . . . Renewal by Mutual Consent and Course of Dealing.").

[94] ECF No. 39 at 37–40 ("Similarly, no written consent was provided by either party in 2019. However, the parties continued to conduct their business as if the Management Agreement had been renewed . . . . [T]he Agreement was thus renewed for a two-year term in June 2019.  This term will expire on July 1, 2021.").

[95] ECF No. 40-1 at 2.

Management Agreement."[96]  I am aware that the defendants vehemently disagree about whether they properly terminated the agreement, but I cannot consider facts, however exhaustive, contradicting the pleadings on a Rule 12(b)(6) motion.  Such factual disputes must be resolved at a later stage.  I thus deny the defendants' motion to dismiss these claims against APA-LV.

The governing-board members, however, are not parties to the management agreement and cannot be held liable for a breach of the agreement or any of its implied covenants.  Contract terms are governed by their explicit, unambiguous terms.[97]  It goes undisputed that APA-LV, an incorporated non-profit organization, and not the board members, signed the contract.[98]  APS argues, without support, that the governing-board members should be held liable for the breach because they "are APA-LV" and "took all the actions that resulted in the breach."[99]  Reading between the lines, it appears that APS argues that the governing-board members are alter egos of APA-LV and wish me to pierce the corporate veil, which generally protects corporate actors from liability for corporate acts.[100]  But I decline to do so because APS has not even attempted to allege facts showing (1) that APA-LV is "governed and influenced by the people asserted to be its alter egos," (2) that "there is a unity of interest and ownership such that the two are inseparable," and (3) that "adherence to the fiction" of a separate entity would "sanction a fraud

---

[96] ECF No. 39 at 46–47.

[97] *Ellison v. Cal. State Auto. Ass'n*, 797 P.2d 975, 977 (Nev. 1990) (citing *Phillips v. Parker*, 794 P.2d 716 (1990)).

[98] *See* ECF Nos. 39 at 16; 40-1 at 13.

[99] ECF No. 45 at 11.

[100] *Paul Steelman, Ltd. v. Omni Realty Partners*, 885 P.2d 549, 550 (Nev. 1994) (articulating the fairly high bar for "disregarding the corporate entity" in a breach-of-contract action).

or promote injustice."[101]  Nor has either side briefed such a theory.  So I grant the governing-board members' motion to dismiss the breach-of-contract and breach-of-the-implied-covenant claims against them with leave to amend.

### 4.    Unjust enrichment

To state a claim for unjust enrichment, a plaintiff must allege that it conferred a benefit on the defendant, the defendant appreciated the benefit, and "there is acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for [it] to retain the benefit without payment of the value thereof."[102]  APA-LV argues that the contract between the parties nullifies any unjust-enrichment claim, while Hulet disclaims receiving any actual benefit and that APS did not actually suffer a loss.[103]  With respect to APA-LV, while "an express, written contract" between the parties may render "a theory of unjust enrichment" unavailable at the recovery stage,[104] Rule 8 explicitly allows parties to plead alternate theories of relief.[105]  As for Hulet and the governing-board members, APS argues that those parties

---

[101] *House of Brussels Chocolates, Inc. v. Whittington*, 238 P.3d 820, 822 (Nev. 2008) (unpublished) (quoting *Ecklund v. Nev. Wholesale Lumber Co.*, 562 P.2d 479–80 (Nev. 1977)) (internal quotation marks omitted).

[102] *Certified Fire Prot. Inc. v. Precision Constr.*, 283 283 P.3d 250, 257 (Nev. 2012) (internal quotation marks and citations omitted).

[103] ECF No. 53 at 11.  Additionally, Hulet and the governing-board members assert that APS has no damages.  But because they make these arguments only in their reply briefing, I do not consider them.  *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("[A] district court need not consider arguments raised for the first time in a reply brief.").

[104] *Leasepartners Corp. v. Robert L. Brooks Trust Dated November 12, 1975*, 942 P.2d 182, 187 (Nev. 1997).  APA-LV merely incorporates its arguments regarding APS's breach-of-contract claims in discussing APS's unjust-enrichment claim.  *See* ECF No. 42 at 3.  I have addressed those arguments *supra*.

[105] Fed. R. Civ. P. 8(d) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically . . . .  A party may state as many separate claims or defenses as it has, regardless of consistency.").  Multiple district courts in the 9th Circuit agree.  *See, e.g.*, *Philips Med. Cap., LLC v. Med. Insights Diagnostics Ctr., Inc.*, 471 F. Supp. 2d 1035, 1047 (N.D. Cal. 2007) ("Although Counter-Claimants may not ultimately prevail on their claim for

benefited by stealing, receiving, and retaining APS's copyrighted materials and intellectual property, despite APA-LV breaching the parties' agreement, to be used in those parties' later business ventures.[106]  Hulet's proffered factual disagreement is inappropriate for resolution on a Rule 12(b)(6) motion.  And the governing-board members do not respond to APS's argument at all or explain in their joinder why Hulet's arguments apply to them.[107]  So I deny the motion to dismiss the unjust-enrichment claim against any defendant.

### 5.    *Conversion*

To adequately state a conversion claim, a plaintiff must allege facts showing "a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein or in derogation, exclusion, or defiance of such title or rights."[108] Hulet claims that APS fails to allege facts that she took its property or that she was not entitled to that property.[109]  APA-LV claims that it has taken nothing for which APS wasn't paid.[110]  And the governing-board members argue that there are no allegations that they personally took APS's property.[111]  APS does not address APA-LV and the governing-board members' arguments, instead focusing on Hulet, who it alleges "confiscated APS computers containing APS's

---

[implied contract] if, it turns out, there is a valid express contract between the parties, Counter-Claimants may plead in the alternative.").

[106] ECF No. 45 at 12.

[107] *See* ECF No. 54 at 8–9.

[108] *Wantz v. Redfield*, 326 P.2d 413, 414 (Nev. 1958); *Evans v. Dean Witter Reynolds, Inc.*, 5 P.3d 1043, 1048 (Nev. 2000).

[109] ECF No. 40 at 17.

[110] ECF No. 42 at 4.

[111] ECF No. 41 at 10.

'[c]ommercial [p]roperty," refused to return it, and erased some of its data.[112]  This is sufficient at the pleading stage to state a claim against Hulet, though insufficient to state a claim against APA-LV or its governing-board members.  So I grant APA-LV and the governing-board members' motion to dismiss this claim, with leave to amend, and deny dismissal as to Hulet's motion.

### 6.    *Federal and common-law trademark infringement; unfair competition*

Both a federal and common-law trademark-infringement claim requires a plaintiff to allege that it has a valid, protectable mark and that a competing mark has been used in a confusingly similar manner.[113]  And an unfair-competition claim brought under 15 U.S.C. § 1125(a) similarly outlaws the use of a mark in a manner likely to cause confusion or mistake.[114]  APS claims that APA-LV continues to invoke its mark, "American Preparatory Academy," in Las Vegas to advertise its new charter school.  All of the defendants seek dismissal of APS's trademark claims on three grounds: first, they argue they have a legal right to use the mark;[115] second, they claim APS has never sought to protect its mark and thus waived its rights;[116] and third, they assert that they have no interest in infringing on the trademark, demonstrated, in part, by the fact that they renamed themselves "Amplus Academy."[117]  Hulet

---

[112] ECF No. 45 at 13 (quoting ECF No. 39 at ¶ 30).  APS also alleges that the defendants "changed administrative permissions" on APS's servers, excluding APS from accessing its property.  ECF No. 39 at ¶ 28.

[113] *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979); *A.L.M.N., Inc. v. Rosoff*, 757 P.2d 1319, 1321 (Nev. 1988) ("At the heart of [cases alleging] trademark infringement . . . are two questions: Has a protectable right been created?  Has it been infringed?") (alteration in original) (internal quotation marks and citations omitted).

[114] *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014).

[115] *See, e.g.*, ECF No. 40 at 16.

[116] ECF No. 41 at 7–8.

[117] *See, e.g.*, ECF No. 40. at 15.

1  and the governing-board members further seek to dismiss the claim because they are not

2  personally infringing on the mark.[118]

3      APS offers no response to the argument that neither Hulet nor the governing-board

4  members can be held responsible for trademark infringement because they are not personally

5  using the mark, so I grant their motions to dismiss with leave to amend.[119]  But the defendants'

6  remaining arguments with respect to APA-LV are unpersuasive because they rest entirely on

7  facts that contradict or supplement those provided in the pleadings.

8      APS has registered the trademark "American Preparatory Academy," which constitutes

9  "'prima facie evidence' of the mark's validity and entitles the plaintiff to a 'strong presumption'

10  that the mark is a protectable mark" and "inherently distinctive."[120]  With respect to the

11  defendants' first argument, whether APA-LV has a legal right to use APS's mark is the central

12  factual question of this case and therefore cannot support the defendants' motion to dismiss.

13  APS also sufficiently overcomes the defendants' waiver argument because APS alleges that

14  APA-LV only used the name "American Preparatory Academy-Las Vegas" because of its

15  relationship with APS.[121]  And the defendants' third theory turns entirely on their factual

16  assertions that they do not and will not continue to use APS's mark, which cannot be resolved at

17  the pleading stage.  To the extent that the defendants argue that their new name, Amplus

18  Academy, is not infringing, APS has pled sufficient allegations to explain why APA-LV's new

19  _____

20  [118] *See* ECF No. 40 at 15; ECF No. 41 at 8.

21  [119] While APS argues that Hulet "confiscated APS computers," those allegations do not show
that Hulet used the mark and instead support APS's conversion claim.  So I dismiss the unfair-
competition claim, with leave to amend, against Hulet, too.

22  [120] *Zobmondo Ent., LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010) (internal
quotation marks and citations omitted).

23  [121] *See* ECF No. 39 at ¶ 23.  And, regardless, the defendants cite no authority for the proposition
that a trademark owner can waive a trademark by failing to enforce his right to it.

name and branding would still lead to confusion with its mark.[122]  This is also generally an issue

of fact for a jury.[123]  So the motion to dismiss the federal and common-law trademark claims

against APA-LV is denied.

### 7.       *Intentional interference with contractual relations and breach of fiduciary duty*

APS sues Hulet personally for intentional interference with contractual relations and for

breach of her fiduciary duty.  An intentional-interference claim requires APS to prove (1) the

existence of a valid contract between itself and a third party, (2) that Hulet knew or had reason to

know of that contract, (3) that Hulet committed intentional acts designed to disrupt the

contractual relationship or cause a party to breach the contract, (4) that there was breach, (5) that

the breach was caused by wrongful and unjustified conduct, and (6) causation and damages.[124]

But APS's factual allegations do not support this cause of action because APS does not specify

which wrongful acts Hulet committed that caused APA-LV's breach of their agreement.  Of the

acts alleged that are actually wrongful, including the allegation that Hulet stole APS's computers

and intellectual property, APS fails to draw the connection between that theft and APA-LV's

untimely termination of the contract.[125]  In fact, it appears that APA-LV breached the contract

---

[122] ECF No. 39 at 79–81 ("'Amplus Academy' is derivative from American Preparatory Academy.  Use of the mark 'Amplus Academy' would allow APA-LV to use the acronym 'APA' and continue to use the websites [sic] 'apalasvegas.org.'  Given the context of the purported separation between APS and APA-LV, Defendants' revised mark is still likely to cause confusion for the potential customers.").

[123] *See Thane Int'l., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002).

[124] *J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003); *see M&R Inv. Co. v. Goldsberry*, 707 P.2d 1143 (Nev. 1985).

[125] *C.f. Cardwell v. Intel Corp.*, 83 Fed. App'x. 956, 958 (9th Cir. 2003) ("Specifically, Cardwell failed to demonstrate a causal link between his filing of a complaint with the Equal Employment Opportunity Commission and the adverse[-]employment actions taken against him.").  Other district courts have persuasively reasoned similarly.  *See, e.g., Churchill v. Barach*, 863 F. Supp.

*before* Hulet stole the computers—given that they rendered their non-renewal vote on June 11, 2020, and Hulet allegedly stole the computers on July 1, 2020.[126]  This pleading deficit renders its claim implausible.  But APS may still be able to allege sufficient facts to support this claim, so I grant Hulet's motion to dismiss the intentional-interference claim with leave to amend.

APS's breach-of-fiduciary-duty claim suffers from a similar pleading defect.  In Nevada, a plaintiff may seek "damages for injuries that result from the tortious conduct of one who owes a duty to another by virtue of the fiduciary relationship."[127]  Generally, "an employee owes a duty of loyalty to act solely in the interests of her employer within the business area for which she is employed."[128]  But APS has failed to allege what tortious conduct Hulet committed while she was an APS employee that breached her duty, given that she allegedly "us[ed] APS's intellectual property and model"[129] and worked "secretly" to create a new charter school after she had left APS's employ.  I will, however, grant leave to amend this claim as well because this insufficiency may be cured by amendment.

### 8.    *Misappropriation of commercial property*

Nevada has not yet recognized a claim for misappropriation of commercial property.  But the defendants present no arguments that it would not, so for purposes of this motion, I follow

---

1266, 1276 (D. Nev. 1994) ("Here, Churchill's allegations reveal that it was the actions of Continental rather than Barach [that] actually caused her termination.  Churchill, therefore, does not allege facts [that] indicate that Barach's actions were either the actual or proximate cause of her damage.").

[126] ECF No. 39 at ¶¶ 30, 83.

[127] *Stalk v. Mushkin*, 199 P.3d 838, 843 (Nev. 2009).

[128] Restatement (Second) of Agency § 387; *see White Cap Indus., Inc. v. Ruppert*, 67 P.3d 318, 219 (Nev. 2003) (following the Restatement (Second) of Agency § 381 and finding no breach of the duty of loyalty by failing to disclose another employee's preparations to compete with his employer).

[129] ECF No. 45 at 13.

other decisions in this district that have suggested the Nevada Supreme Court would recognize such a claim.[130]  Under California law, which Nevada courts have followed in recognizing commercial torts, a plaintiff must show that (1) it invested substantial time, skill, or money in developing its property; (2) the defendant appropriated and used that property at little or no cost to the defendant; (3) the defendant's appropriation and use of the property was without authorization or consent; and (4) it has been injured.[131]  APS gives short shrift to the defendants' motion to dismiss this claim, merely asserting that it defines the "property" at issue as its curricula, manuals, and training and graphics materials, and that it believes APA-LV will continue to use those materials at its new charter school.[132]  As before, APS makes no allegations that Hulet or the governing-board members are personally misappropriating its property.  APS also does not respond to APA-LV's argument that it paid for these products under the terms of the agreement.[133]  So I dismiss this claim against all the defendants, with leave to amend.

### 9.   Conspiracy

In Nevada, civil conspiracy requires "a combination of two or more persons, who by some concerted action, intend to accomplish some unlawful objective for the purpose of harming

---

[130] *See, e.g.*, *SHC Holdings, LLC v. JP Denison, LLC*, No. 2:17-cv-02718, 2020 WL 1308322, at *4 (D. Nev. Mar. 19, 2020); *Salestraq Am., LLC v. Zyskowski*, No. 2:08-cv-01368, 2009 WL 165170, at *3 (D. Nev. June 10, 2009), *aff'd*, 334 Fed. App'x. 125 (9th Cir. 2009) (noting that Nevada recognizes claims closely related to commercial misappropriation and that California, which Nevada has followed when recognizing new commercial tort theories, recognizes a claim for misappropriation of non-trade-secret information).

[131] *United States Golf Ass'n v. Arroyo Software Corp.*, 69 Cal. App. 4th 607, 618 (Cal. App. 1999).

[132] ECF No. 39 at ¶¶ 25, 81 ("Defendants are representing to parents and students that nothing about the school will change and that the new school will offer the same curriculum and training as it did prior to the purported separation from APS."), 82.

[133] *See* ECF No. 54 at 10.

another which results in damage."[134]  "A civil conspiracy claim operates to extend, beyond the active wrongdoer, liability in tort to actors who have merely assisted, encouraged, or planned the wrongdoer's acts."[135]  "While the essence of the crime of conspiracy is the agreement, the essence of civil conspiracy is damages," which centers on the underlying wrongful act.[136]

APS rests its conspiracy claim on the defendants' misappropriation-of-commercial-property, breach-of-contract, and trademark-infringement claims.[137]  As I discussed above, APS's misappropriation-of-commercial-property claim does not survive the defendants' motions and thus cannot support its conspiracy claim.[138]  While both APS's trademark-appropriation and breach-of-contract claims[139] survive, it is unclear when the conspiracy to commit those acts took place and whether the individual defendants can be legally liable for that alleged conspiracy. Under Nevada law, "agents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage."[140]  APS has not clarified when the breach of contract actually happened—if it occurred after APA-LV hired Hulet, then there can be no conspiracy; if it occurred when APA-LV voted "not to renew" the contract, then it may have

---

[134] *Collins v. Union Fed. Sav. & Loan Ass'n*, 662 P.2d 610, 622 (Nev. 1983) (internal citations omitted).

[135] 16 Am. Jur. 2d Conspiracy § 57 (1998).

[136] *Id.* at § 50.

[137] ECF No. 45 at 15.

[138] Although I grant APS leave to amend its misappropriation-of-commercial-property claim, if it proceeds with this claim as the basis for its conspiracy claim, APS must sill clarify when the tortious conduct took place to state a claim for conspiracy.

[139] *Cadle Co. v. Woods & Erickson, LLP*, 345 P.3d 1049, 1052 (Nev. 2015) ("In Nevada, however, civil conspiracy liability may attach where two or more persons undertake some concerted action with the intent to commit an unlawful objective, not necessarily a tort.").

[140] *Collins*, P.2d at 622.

sufficiently pled conspiracy because Hulet was not yet part of the non-profit.  And with respect to its trademark-infringement claims, APS clearly alleges that the infringement took place after APA-LV hired Hulet, which likely precludes its civil-conspiracy claim as a matter of law.[141] These pleading deficits may be remedied, so I grant the defendants' motions to dismiss with leave to amend so that APS can take another shot at this civil-conspiracy claim.

## Conclusion

IT IS THEREFORE ORDERED that APS's motion for a temporary restraining order **[ECF No. 3] is DENIED** and its unopposed motion for leave to file excess pages **[ECF No. 31] is GRANTED.**

IT IS FURTHER ORDERED that the governing-board member defendants' (Elliott, Farthing, Gardner, Iglody, and St. John) and Hulet's anti-SLAPP motions to dismiss **[ECF Nos. 47, 48] are DENIED.**

IT IS FURTHER ORDERED that defendant Hulet's motion to dismiss **[ECF No. 40]**[142] **is GRANTED IN PART:**

- APS's claims for federal and common-law trademark infringement, unfair competition, intentional interference with contractual relations, breach of fiduciary duty, misappropriation of commercial property, and conspiracy claims against Hulet are dismissed without prejudice and with leave to amend;

- APS's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, conversion, federal and common-law trademark infringement, unfair

---

[141] *Id.*

[142] To the extent that APA-LV and the governing-board members' joinders articulate bases for dismissal independent of or supplemental to Hulet's motion, I address them as though they are part of her motion.

competition, misappropriation of commercial property, and conspiracy against the governing-board member defendants (Elliott, Farthing, Gardner, Iglody, and St. John) are dismissed without prejudice and with leave to amend; and

- APS's claims for conversion, misappropriation of commercial property, and conspiracy against APA-LV are dismissed without prejudice and with leave to amend.

- The motion is denied in all other respects.

IT IS FURTHER ORDERED that APS has until November 17, 2020, to amend its complaint consistent with this order.  If it fails to do so, APS's claims against Hulet, APA-LV, and the governing-board members described above will be deemed abandoned and dismissed with prejudice, and this case will proceed only on APS's claims for unjust enrichment and conversion against Hulet, APS's claims for unjust enrichment against the governing-board members, and APS's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, federal and common-law trademark infringement, unjust enrichment, and unfair competition against APA-LV.

_____
U.S. District Judge Jennifer A. Dorsey
October 28, 2020